[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 221 
 ON RETURN TO REMAND
This is an appeal following a second sentencing hearing in this cause conducted pursuant to the opinion of the Supreme Court of Alabama in Ex parte Whisenhant, 482 So.2d 1247 (Ala. 1984).
This appellant was first convicted and sentenced to death for the murder of Cheryl Lynn Payton in 1977. This trial was held in Jefferson County after venue was changed from Mobile County. On February 20, 1979, his conviction was reversed by this court because of an improper prosecutorial closing argument.Whisenhant v. State, 370 So.2d 1080 (Ala.Cr.App. 1979). This appellant was retried in August of 1981 in Mobile County and was again convicted and sentenced to death. On November 23, 1982, his conviction was affirmed, but the case was remanded for a new sentencing hearing because of prosecutorial comments in the opening statements of his sentencing hearing. Whisenhantv. State, 482 So.2d 1225 (Ala.Cr.App. 1982). On cross petitions for certiorari, the Supreme Court of the State of Alabama remanded this cause for a determination of whether the error was harmless. Ex parte Whisenhant, 482 So.2d 1241 (Ala. 1983). The Alabama Court of Criminal Appeals ruled this error harmless and affirmed the death sentence. On May 11, 1984, the Supreme Court of the State of Alabama reversed, remanding the case to this court with directions that this cause be remanded to the trial court 482 So.2d 1247 (Ala. 1984). On June 26, 1984,482 So.2d 1249, the Alabama Court of Criminal Appeals remanded this cause to the Circuit Court of Mobile County for a new sentencing hearing pursuant to the opinion of the Supreme Court of the State of Alabama in Ex parte Whisenhant, 482 So.2d 1247
(Ala. 1984).
Following this hearing, the jury's unanimous verdict recommended the death sentence be imposed. The trial judge conducted a separate hearing sentencing this appellant to death by "electrocution." (The trial judge's findings and order are hereinafter attached as Appendix A.) The Alabama Court of Criminal Appeals has jurisdiction in this matter pursuant to the Alabama Automatic Appeals Statute, § 12-22-150, Ala. Code (1986). *Page 222 
This court adopts the facts as set out in this court's original opinion of Whisenhant v. State, 370 So.2d 1080
(Ala.Cr.App. 1979).
From this hearing and order, this appellant raises fourteen issues in his original brief and seven issues in his appeal of this sentencing hearing. These issues will be addressed in sequence below.
 I
The appellant reasserts many of the same issues which this court has previously addressed. Issues I through XII ofWhisenhant v. State, 482 So.2d 1225 (Ala.Cr.App. 1982), and this court's holding in Whisenhant v. State, supra, and Exparte Whisenhant, 482 So.2d 1241 (Ala. 1983), are dispositive of these issues. Issues IV and V of the appellant's original brief will hereinafter be addressed.
 II
Issue IV of the appellant's original brief was not addressed in Whisenhant v. State, 482 So.2d 1225 (Ala.Cr.App. 1982). Issue IV and issue V of the appellant's original brief allege prejudice to this appellant and a denial of the appellant's right to reliability in the capital sentencing process due to prosecutorial comments during the sentencing hearing. This court remanded this cause to the circuit court because of prosecutorial comments in this matter. Because of this court's decision to remand this cause in Whisenhant v. State, supra, these issues are no longer applicable to this cause and will not be addressed by this Court. The order of a new sentencing hearing prevents the appellant from reasserting these issues due to the absence of this error in the subsequent hearing.
 III
This appellant alleges that the trial judge erred in refusing to recuse himself. There was no error in the trial judge's refusal to recuse himself in this cause. The appellant's argument is based on a statement by the trial judge which the appellant claims shows a predisposition to reject two mitigating circumstances which the appellant planned to base his claim for a sentencing of life without parole.
This statement occurred in the trial judge's ruling in the defendant's motion in limine to prohibit the State from calling the victim's husband or family members as witnesses.
The statement in question and the judge's response to the appellant's counsel's motion to recuse are stated below.
"THE COURT: You all want to comment on that?
 "MR. GALANOS: Yes, sir. Number one, we're in a posture where this jury obviously will not have heard any of the facts and though identity is not in issue, Douglas Payton could —
 "THE COURT: I would be very, very surprised if the State — if this jury didn't hear all the evidence, but go ahead.
 "MR. GALANOS: Douglas Payton can identify clothes found in the Defendant's truck as being his wife's clothes, Douglas Payton can say that he left — took his wife to work that day at or about 2:30 in the afternoon and he can also relate the circumstances of her disappearance.
 "THE COURT: Yeah, you know, Mr. Dees, you and I both have tried this case a number of times. I think it would be putting a strangle hold on the State that I shouldn't do and I think it even goes back to your insanity question. The victim in this case, as I recall the evidence, was abducted with Entebbe precision and he certainly has to — you know, which an irrational person I do not believe could have formed. But he is — he's in the position — you're asking me to put the State in the position of not telling the jury the entire story. So, I can't do that. So, I deny that motion.
 "MR. DEES: Your Honor, at this time I renew my motion for recusal based on the remark the Court just made about the Court's opinion of the evidence in the prior trial of the Defendant kidnapping with Entebbe precision that no irrational person could do, which means the Court has already — based on facts the Court already knows, has already got a fixed *Page 223 
opinion as to whether the Defendant would be — would violate —
 "THE COURT: Well, if that's what you take from that remark, you're entitled to do that, but I don't agree with it.
"All right, the next motion —
 "MR. DEES: Pardon me, sir, can I finish that for the record?
"THE COURT: You may —
 "MR. DEES: That the Court has already in effect rejected mitigating circumstances number five and number six of 13-11-6, Code of Alabama, 1975, which applies in this case.
 "THE COURT: Well, I don't think I have, but you have your record.
"MR. DEES: Well, you haven't denied that motion.
"THE COURT: I deny that motion.
"MR. DEES: Thank you, sir."
The appellant has failed to present evidence that creates a doubt as to this judge's ability to preside over this matter with impartiality. While Canons of Judicial Ethics relating to a judge's duty to disqualify himself has the force of law, both judges and the bar should be aware that refusal is not required on mere accusation of bias unsupported by substantial fact. Canon of Judicial Ethics, Canon 3, subd. C(1). Taylor v.Taylor, 359 So.2d 395 (Ala.Civ.App. 1978); Ross v. Luton,456 So.2d 249 (Ala. 1984); Duncan v. Sherrill, 341 So.2d 946 (Ala. 1977); Moreland v. State, 469 So.2d 1305, cert. denied,469 So.2d 1305 (Ala.Cr.App. 1985).
"The failure by the judge who presided at the defendant's original capital murder trial to recuse himself at the second sentencing hearing, following reversal of the original sentencing order, was not improper, in absence of any evidence to substantiate defendant's assertion of personal bias."Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App. 1987), reversed on other grounds, Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988).
"While a true personal bias will disqualify a jury, a judicial bias, if one exists, will not disqualify a trial judge from hearing a case. Koch v. State, 401 So.2d 796
(Ala.Cr.App.), cert. denied, 401 So.2d 801 (1981). Appellant has failed to demonstrate any semblance of a personal bias on the part of the trial judge." Whisenhant v. State,482 So.2d 1225 (Ala.Cr.App. 1982); Moreland v. State, 469 So.2d 1305
(Ala.Cr.App. 1985); McMurphy v. State, 455 So.2d 924
(Ala.Cr.App. 1984); Lokos v. State, 434 So.2d 818 (Ala.Cr.App. 1982), aff'd, 434 So.2d 831 (Ala. 1983). In this instance, the judge stated that his views were founded on evidence presented at the previous trial of this cause. Moreover, a personal bias is one of extra-judicial origin; thus, if any bias existed in this instance, then it would be a judicial bias. Koch v. State, supra; Ex parte White, 53 Ala. App. 377, 300 So.2d 420, 430, cert. denied, 293 Ala. 778, 300 So.2d 439 (1974). However, a careful review of the record in this cause shows that the trial judge carefully considered this appellant's evidence relating to this appellant's mental condition.
 IV
The appellant alleges that the trial court's denial of his motion for change of venue violated the appellant's rights to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States.
Section 15-2-20, Code of Alabama, 1975, states that a defendant is entitled to a change of venue to another county if he can show to the reasonable satisfaction of the trial court that a fair and impartial trial cannot be had in the county from which the indictment is found. This appellant has the burden of proof in proving that he could not receive a fair trial in Mobile County. Acoff v. State, 50 Ala. App. 206,278 So.2d 210 (1973); Robinson v. State, 430 So.2d 883 (Ala.Cr.App. 1983); Ex parte Magwood, 426 So.2d 929 (Ala.), cert. denied,462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).
 "The determination of whether or not to grant a change of venue is a matter generally left to the sound discretion of the trial court. Mathis v. State, 52 Ala. App. 668, 296 So.2d 755 (1973), cert. denied, 292 Ala. 732, 296 So.2d 764 (1974); Flurry v. State, 52 Ala. App. 64, 289 So.2d 632 (1973), cert. denied, 292 Ala. 720, *Page 224 289 So.2d 644 (1974); Acoff v. State, 50 Ala. App. 206, 278 So.2d 210 (1973); Turner v. State, 410 So.2d 458 (Ala.Cr.App. 1981). This is generally the law because the trial court is in the best position to weigh the evidence and 'evaluate the prejudicial atmosphere' surrounding the accused's case. Botsford v. State, 54 Ala. App. 482, 309 So.2d 835, cert. denied, 293 Ala. 745, 309 So.2d 844 (1975); Burnett v. State, 350 So.2d 718 (Ala.Cr.App. 1977)."
Robinson v. State, 430 So.2d 883 (Ala.Cr.App. 1983); Nelson v.State, 440 So.2d 1130 (Ala.Cr.App.), cert. denied,440 So.2d 1130 (Ala. 1983). See also, Fortenberry v. State, 545 So.2d 129
(Ala.Cr.App. 1988).
In reviewing the evidence presented in this cause, we find that the appellant did present evidence of news media and widespread publicity of this matter. However, we find no evidence of an inherently prejudicial climate that would prevent this appellant from receiving a "fair and impartial trial." Robinson v. State, supra. This appellant has also failed to show that the publicity was anything but factual.
"Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial." Dannelly v. State, 47 Ala. App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729,254 So.2d 443 (1971); Acoff v. State, supra; Mathis v. State, supra;Robinson v. State, supra; Patton v. Yount, 467 U.S. 1025,104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).
In this cause, the trial court limited the appellant's individual voir dire to questions concerning juror knowledge of the specific facts of the appellant's case and of his prior sentences. (R. 431-436, 445-641) The appellant alleges that the trial court erred in this instance, but this court does not agree. There is no right to individual voir dire, even in capital cases. Bell v. State, 475 So.2d 601, 607 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala. 1985), cert. denied,474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). This error is also not supported by the record. A review of the record especially R. 22-23 and R. 405 shows that the trial court asked all the questions necessary to insure that the jurors would give this appellant a fair and impartial trial. This appellant was only restricted from asking questions regarding the nature of any publicity in front of a jury panel of twelve. This restriction was to prevent the tainting of the entire jury panel. The appellant was allowed to ask the jurors questions of pretrial publicity during individual voir dire, but the appellant also alleges that his individual voir dire was restricted (R. 448-449). A review of the record does not support this appellant's contention. Furthermore, the trial court specifically asked the jurors to raise their hands if they felt that they could not set aside what they knew of this case and "sit as fair and impartial juror[s]." (R. 206-207, 368) All jurors who raised their hands were excused from the jury panel. Thus, there was no prejudice because the trial court properly questioned the venire members about whether they were affected by the pretrial publicity.
In reviewing this matter, we find no abuse of discretion by the trial court, nor was this appellant deprived of a fair and impartial trial. Thus, the trial court was not in error in its denial of a motion for a change of venue. Nelson v. State, supra; see also Arthur v. State, 472 So.2d 650 (Ala.Cr.App. 1984), rev'd on other grounds, Ex parte Arthur, 472 So.2d 665
(Ala. 1985).
 V
This appellant alleges that the attorney general's pretrial press conference constituted prosecutorial misconduct which denied this appellant of due process. The appellant alleges that this press conference violated a long standing injunction and violated the Code of Professional Responsibility of the Alabama State Bar, specifically, Disciplinary Rule 7-107.
In reviewing this appellant's allegations of prosecutorial misconduct, this court finds that the appellant was not deprived of due process nor prejudiced in any way. The prospective jurors were polled by the trial judge prior to the jury selection process. The judge asked, "Is there any member of the jury who thinks because of the *Page 225 
recollection that you may have about this case, whether it be from radio, television or newspaper, that it would be impossible for you to sit as a fair and impartial juror in the penalty stage of this case? That is what you have read, what you have seen or heard on television, would that in any way bias or affect you in any way from rendering a fair and impartial verdict in this case. If you feel that it would simply raise your hand." All jurors who raised their hands were excused.
In reviewing the record, we find that the trial judge carefully considered this matter while hearing the appellant's motion for change of venue. There was no abuse of discretion by the trial court, and the appellant was not deprived of a fair and impartial trial. Thus, the trial court properly denied the appellant's motion for change of venue in which it considered the prejudicial effects of the news conference in question. SeeRobinson v. State, supra; Acoff v. State, supra; Botsford v.State, supra; Nelson v. State, supra.
 VI
The appellant alleges that the trial court erred in its exclusion of juror Karen Steadham based on her inability to impose the death penalty.
The following is juror Karen Steadham's testimony in response to questions asked of her regarding this issue.
 "JUROR: No, I just asked one question, asked what had he done, and they told me. I didn't ask if he was supposed to be in prison for the rest of his life and if they was going to send him to electric chair, because that really to me — I'll tell you all now, I don't care what they do to him. I mean, that's bad. I don't know the man and I could care less.
"MR. DEES: All right.
 "JUROR: I mean, if he was somebody to my family, I would care, but, you know, I'm not his lawyer, I'm not his doctor or nothing else. I don't care what you all do to him.
 "MR. DEES: Well, now, let me ask you this, Karen, since you said you don't care what they do to him, my understanding is that you — suppose it's true that he did — what if it comes out in evidence that he did just what they said, you know, he did cut up these like this. Would you be inclined in that situation to vote death and not life imprisonment.
 "MR. CARNES: Object, Your Honor. She wouldn't have heard the evidence.
"MR. DEES: I just —
 "THE COURT Broaden that. Assuming that you heard all the evidence and aggravating and mitigating circumstances, and, you know, there will be both presented to the jury, would you automatically be inclined to vote for death because of what you've heard.
"JUROR: Well, myself personally?
"THE COURT: Yes, ma'am.
 "JUROR: I really — it's not my place to tell somebody they should die.
"THE COURT: Well, you —
 "JUROR: I mean, you know, as far as the electric chair and other people sitting down and telling somebody — you know, send them to the electric chair, they — as far as I'm concerned, the Lord did not — he don't want you to kill people and if I tell you all to go and kill him, I might as well take him outside and shoot him in the head.
"THE COURT: Okay. Any other questions?
"MR. DEES: Are you opposed to the death penalty?
 "JUROR: I don't care if somebody else tells him to go, but myself, I'm not going to go and sit in the jury and say send him to the death sentence.
"MR. DEES: I see.
 "JUROR: But also our jails are too crowded for him to sit in our jails. So, I don't what what you all are going to do with him.
"MR. GALANOS: Are you through, Morris?
 "If there might be a situation where you might have to decide what to do with him, and what we're trying to find out is if you were selected as a juror in this case, if you were one of the twelve people that's going to decide this man's fate, *Page 226 
would you automatically because of your feelings about religion and the death penalty, would you automatically vote to impose a sentence of life without parole, regardless of what the facts were and regardless of what the law might be? Life without parole or death by electrocution, because you're going to be limited to those two choices.
 "JUROR: I guess I'll have to say yes, because — I don't know. You all say you're not supposed to kill, but if I tell you all that, then I just might as well — I'm doing the same thing.
 "MR. GALANOS: Okay. So, I want — you said your answer was yes. Does that mean yes, you would automatically vote to impose a penalty of life without parole, but not death by electrocution?
"JUROR: Mm-hm.
 "MR. GALANOS: Well, thank you for your candor, because as Mr. Dees said, all we're asking folks to do is just tell us how they feel.
 "THE COURT: Well, look, I know you feel like you're getting grilled by all these folks, but I'm going to have to ask you one more question now. Okay?
"JUROR: Yes, sir.
 "THE COURT: Are you telling me that if the facts were presented to you that — and you listened to the facts and circumstances, that you would automatically go in, if you were on the jury, and vote for life in prison without parole? You would not even consider death by electrocution.
 "MR. CARNES: I'd like to object to His Honor's question on the grounds that it's not the test under (inaudible).
 "THE COURT: Well, that's the way I'm going to ask it.
 "JUROR: Well, I'm not sure. Myself, I don't believe that I should go up there and tell them to kill him, but he did it to somebody else. I mean, you know, I'm not sure.
 MR. GALANOS: Can I ask you this, Karen, and again I'm not trying to give you a hard time, just trying to find out how you feel. If you're chosen to sit on this jury and if the facts are such that the State proves what we call aggravating circumstances — those would be circumstances which indicate or tend to indicate that the appropriate punishment is death by electrocution — and those aggravating circumstances in your heart and in your mind outweigh what are called mitigating circumstances — that would be evidence that Mr. Dees would put on that would indicate or tend to indicate that the appropriate punishment should be life without parole. But if the aggravating circumstances, circumstances in favor of the death penalty, outweigh mitigating circumstances, could you — and then after the Judge charges you on the law of the case, could you vote to impose the penalty of death by electrocution as opposed to life without parole?
 "JUROR: I don't know. To me, I guess, (inaudible) it has to be done.
 "MR. GALANOS: But it's not a question of what they would do, it's a question of what you would do.
 "JUROR: That's what I said. I don't know what I would do. I hope I don't have to be in the situation, I'll tell you now.
 "THE COURT: Let me assure you, sugar, there's no one out there that wants to be in that situation.
 "MR. GALANOS: Judge, I believe Mr. Carnes has a question.
"THE COURT: Go ahead, Mr. Carnes.
 "MR. CARNES: Just one other thing, and I know we're trying your patience with rephrasing. It is true that — only you know how you feel and I want you to understand that everybody here agrees that you have right to whatever feelings. We just have to find out before we select a jury certain things. You know your feelings and is it your feelings as you know them and as the Court process has been explained to you in this case, if those feelings might prevent or substantially impair you from being a juror to decide between death by electrocution and life imprisonment without parole under the facts and law you were given?
"JUROR: Would I have trouble?
"MR. CARNES: Yes, ma'am. *Page 227 
"JUROR: Is that what you're asking? Yes, sir.
MR. CARNES: Would you have serious trouble.
"JUROR: Yes, sir. I would — I don't know.
 "MR. CARNES: That's fine, I understand. I apologize for keeping on and keeping on.
"THE COURT: Anything else, gentlemen?
"MR. DEES: That's all.
 "THE COURT: All right. Karen, if you will, ask them to bring back Patricia Lee for me.
"JUROR: Yes, sir.
"* * *
 "MR. CARNES: Judge, on the basis of your observing her demeanor and her answers to those questions, we would ask that you find that her views, as you observed them, would prevent or substantially impair her from performing her duties as a juror under her oath and according to law and that you remove her for cause on that ground.
 "MR. DEES: Your Honor, I would strenuously object to that.
 "THE COURT: Well, she never one time said she couldn't.
 "MR. CARNES: That's not the test, Your Honor. The test under Witherspoon-Witt is whether her views would prevent or substantially impair her from doing so and she said she would have very serious trouble.
 "THE COURT: Well, that's true, she did do that, Morris.
 "MR. DEES: That's not the sole question though. Let the Court rule on it —
 MR. CARNES: And, Your Honor, what I'm saying too is you observed her demeanor. So, you should apply the Witt and Witherspoon test based on her demeanor as well as the answer. I've never seen a more halting answer. She lowered her head when she was talking and she — it was very obvious that her view was very strong about the subject.
 "THE COURT: Yeah, I agree. All right, I'll strike her over the objections of Mr. Dees."
"The standard for determining if a juror is disqualified from serving in a death penalty is whether his views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841
(1985)." "It need not be shown with 'unmistakable clarity' that the person would automatically vote against the death penalty.Wainwright v. Witt, supra." Freeman v. State, supra. See alsoWitherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968). Moreover, a finding of whether a venireman is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judges province. . . ." Wainwright v. Witt, supra. "The manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words." Reynolds v. UnitedStates, 98 U.S. 145, 156-157, 25 L.Ed. 244 (1878).
In reviewing the testimony of juror Karen Steadham, we find no error in her exclusion. Moreover, we find that it is evident from the record that her views of capital punishment would substantially impair her performance as a juror in this matter. See also Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273,101 L.Ed.2d 80 (1988).
 VII
The appellant alleges that prosecutorial comments in closing arguments stating that the appellant's appeals were not exhausted, violated the appellant's right to reliability in the capital sentencing process, as guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States. The comments in question are as follows:
 "They told you they helped law enforcement and you saw the F.B.I. agent on there, a Mr. Boyle. What did he actually tell you. He actually told you that he gets — all this about this center starting because of Tommy Whisenhant. He actually told you he got a letter from up there at F.B.I. headquarters, find us *Page 228 
somebody, and what was the criteria. The criteria is he's got four murders and his appeals are exhausted. Well, his appeals aren't exhausted. He talks to Mr. Dees and he talks to Tommy Whisenhant. Mr. Dees said, well, Whisenhant made the decision, made it himself, but he did make the decision, and he says he couldn't have anything to gain. He didn't have anything to gain? He's in this courtroom right now trying to get you to consider that, and he was aware this hearing was coming up. That means Tommy Whisenhant himself knows he had something to gain and he had something to gain by doing it and he, with good common sense, decided to do it. Now, Mr. Boyle told you after they filled out that questionnaire they sent it off and he's never heard from it again. He didn't tell you this big foundation was started because of that. He didn't tell you some center was started because of that, but he did tell you something that was significant as to why Tom Whisenhant would appear and answer that questionnaire and also give a deposition in court in that civil case. He enjoyed the attention. He hadn't talked to anybody for a while. He liked folks making a fuss over him."
This comment in no way undermines the jury's role and allows the jurors to shift the burden of their decision to an appellate court. We find no merit to the appellant's argument that the jurors would be biased in favor of the death penalty. In fact, the prosecutor was responding to comments made by the appellant's witness two days earlier in order to "right the scale." United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038,1044, 84 L.Ed.2d 1 (1985). In this instance, the prosecutor was attempting to point out that this appellant did not fit the proper criteria for the FBI study, and, thus, his cooperation was self-serving in that it may be considered a non-statutory mitigating circumstance on appeal.
 VIII
The appellant argues that the court erred in refusing to give the appellant's jury charge number 10 which asked that the trial court list those non-statutory mitigating circumstances supported by the evidence presented at sentencing trial. The following is the charge:
 "— First, that [appellant] had psychological and emotional problems when he committed the capital offense;
 — Second, that [appellant's] early family history contributed to his conduct.
 — Third, that [appellant] has made efforts to assist law enforcement;
 — Fourth, that [appellant] has made efforts to help the victim's family; and
 — Fifth, that [appellant] has made a good adjustment to life in prison." (T. 157; RRR. 682-687)
In reviewing the trial court's oral charge, this court is not in agreement with the appellant.
"Refusal to give written requested charges was not error when charges were either thoroughly covered in the trial court's oral charge, or inapplicable or abstract, or an incorrect statement of the law." Sasser v. State, 494 So.2d 857
(Ala.Cr.App. 1986); Oates v. State, 375 So.2d 1285 (Ala.Cr.App. 1979).
This court has reviewed the trial court's oral charge to the jury and finds no error. Furthermore, we find that the requested jury charge was properly refused because it was substantially covered in the trial court's oral charge. (R. 776-804) See § 12-16-13, Code of Alabama 1975, as amended. Moreover, this argument has been rejected by this court and the Eleventh Circuit. Cochran v. State, 500 So.2d 1161, 1173-1175
(Ala.Cr.App. 1984), aff'd in pertinent part, remanded on other grounds, 500 So.2d 1179, 1186 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064
(Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965,95 L.Ed.2d 537 (1987); Tucker v. Zant, 724 F.2d 882, 891-892 (11th Cir. 1984).
 IX
The appellant alleges that the trial court erred in allowing the testimony of the victim's mother during the judge's sentencing hearing. This witness testified *Page 229 
that the victim had expressed fear for her life after the murder of a convenience store clerk in autumn of 1975. The appellant alleges that this testimony is not relevant to the aggravating circumstances that this crime was heinous, atrocious, and cruel. The State's contention was that it was relevant to "demonstrate the mental anguish of the victim in anticipation of what she believed to be certain death." (RRR. 816) The trial court found that awareness of these crimes and fear of her death gave the victim in this cause reason to know that, at the time of her abduction, she would certainly be killed. This finding was proper, see Ex parte Kyzer,399 So.2d 330 (Ala. 1981); Copeland v. State, 457 So.2d 1012 (Fla. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324
(1985). See also, Preston v. State, 444 So.2d 939 (Fla. 1984). The appellant also alleges that this testimony is inadmissible hearsay, and not within any hearsay exception. This is incorrect. A person's statement asserting an emotion such as fear is admissible as a hearsay exception. C. Gamble, McElroy'sAlabama Evidence, § 263.01(11) (3d ed. 1977).
Moreover, this evidence was not before the jury, but was presented before the judge in his sentencing hearing. "The fact that, as evidence is being given ore tenus, the court overrules a party's objection, is not, standing alone, sufficient to show that the court, on its final consideration of the case, allowed the objected to testimony, if irrelevant, immaterial, incompetent, to exert any influence upon his determination of the issue." Joiner v. State, 232 Ala. 522, 168 So. 885 (1936).Gray v. Reynolds, 514 So.2d 973 (Ala. 1987); Gaston v. Ames,514 So.2d 877 (Ala. 1987).
 X
This court is required by § 13A-5-53, Code of Alabama 1975, to review the propriety of the appellant's death sentence and to examine the record for any errors adversely affecting his conviction. We have thoroughly reviewed this record and find no errors adversely affecting this appellant's rights. See Beck v.State, 396 So.2d 645 (Ala. 1980); Rule 45A, A.R.A.P.
The trial court found the existence of four aggravating circumstances in this case: (1) "the defendant committed the capital offense of raping and murdering Cheryl Lynn Payton on October 16, 1976, while he was still under a twenty-year federal sentence of imprisonment he had received on March 14, 1966, for assault with intent to murder" which constitutes a § 13-11-6(1) aggravating circumstances. (2) "The defendant was previously convicted of three crimes which involve violence to a person, and any one of them is sufficient to establish [a § 13-11-6(2)] aggravating circumstance." (3) "A 13A-5-49(4) aggravating circumstance does exist. The capital offense involves a rape. This defendant murdered Cheryl Lynn Payton after raping her." (4) "Considering all of the circumstances this capital offense was especially heinous, atrocious and cruel. The heinousness, atrociousness, and cruelty in this capital offense exceeded by far that which is present in every capital offense." (§ 13-11-6(8).)
The trial court stated in its sentencing order (which is attached to this opinion as Appendix A), that the first three aggravating circumstances are supported by the jury's verdict and supported by the evidence in this case. The guilt of this appellant is undisputed. The final aggravating circumstance is clearly supported by the facts included in the record. The defendant did not suddenly kill Cheryl Lynn Payton without her having to suffer the anticipation of her death at the hands of her murderer. Instead, she was abducted and taken into the woods where he raped her in the cab of his pickup truck. He then marched her into the woods and shot her to death. Cheryl Lynn Payton was aware of the death of a recent victim, and she had reason to know that the appellant was going to kill her long before he did so. The body of the victim was also mutilated. These facts convince this court that this capital offense was especially heinous, atrocious, and cruel. SeeGrayson v. State, 479 So.2d 69 (Ala.Cr.App. 1984), aff'd,479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 *Page 230 
(1985); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App. 1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975-,106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
The trial court did not find the existence of any statutory mitigating circumstances, but did find the following nonstatutory mitigating circumstances: (1) "The fact that the defendant was under some mental or emotional disturbance at the time of the crime"; (2) "The court does and will consider the personality disorders [schizoid personality, paranoid tendencies, and necro-sadistic desires] as non-statutory mitigating circumstances and give them such weight as they deserve." (3) "The specific details of the Defendant's childhood and the general circumstances of his childhood are and will be considered as non-statutory mitigating circumstances." (4) "The defendant has made a good adjustment in prison since the commission of the crime. That is true, and that is a non-statutory mitigating circumstance which is and will be considered." (5) "The defendant also aided the family of the victim to collect damages from the Federal Government for the negligent release of the defendant from federal prison. That is also a non-statutory mitigating circumstance which is and will be considered." "The court [also] finds that the Defendant has never felt genuine remorse and his cooperation in the civil lawsuit came while he was awaiting re-sentencing. His cooperation was motivated by the hope and expectation that it would be considered in his favor when he came to be re-sentenced. Those are the circumstances and weight due to be given it." (6) "The defendant also aided the Federal Bureau of Investigation in a study of violent murders. That [is also] a non-statutory mitigating circumstance."
We do not find evidence in the record that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. This court has also independently weighed the aggravating and mitigating circumstances and found that the aggravating circumstances far outweigh the mitigating circumstances. We are convinced that death is the proper sentence in this case.
This court has considered the crime, and this appellant, and finds that the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases. SeeGrayson; Kennedy; Thompson v. State, 503 So.2d 871 (Ala.Cr.App. 1986), aff'd, 503 So.2d 887 (Ala. 1987); Tarver v. State,500 So.2d 1232 (Ala.Cr.App. 1986), aff'd, 500 So.2d 1256 (Ala.), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685
(1987); Baldwin v. State, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985).
This court has carefully searched the record for plain error and we find none. The appellant's conviction for this offense and his sentence of death are proper as herein stated.
For this reason and those cited herein, the judgment of the trial court is due to be, and it is hereby, affirmed.
OPINION EXTENDED; AFFIRMED.
All the Judges concur.
 APPENDIX A
THE COURT: All right, I will read my sentence finding and order.
On August 6, 1981, the Defendant, Thomas Warren Whisenhant, was convicted by a jury of the Code of Alabama 1975, Section 13-11-2(a)(3) capital offense of rape when the victim is intentionally killed by the Defendant. On February 24, 1987, following a separate sentence hearing, another jury returned a verdict, which is not binding on this Court, sentencing the Defendant to death. On April 2, 1987, another sentence hearing was conducted before this Court sitting without a jury.
Throughout the guilt stage and the sentence stage of this case, it has been essentially undisputed that on the evening of October 16, 1976, the Defendant abducted at gunpoint, raped and shot to death Cheryl Lynn Payton, a female convenience store clerk. The principal defense at the guilt stage was not guilty by reason of insanity. The guilt stage jury rejected that defense, *Page 231 
and this Court independently concludes that the Defendant failed to establish at the guilt stage that he was not guilty by reason of insanity. At the sentence stage hearing, the defense presented psychiatric testimony and evidence which it did not present at the guilt stage trial five and a half years earlier. This Court concludes that even considering that additional psychiatric testimony and evidence, the defense has still failed to establish the not guilty by reason of insanity defense.
This Court is in full accord with the guilt stage verdict and hereby adjudicates the Defendant guilty of the Code of Alabama 1975, Section 13-11-2(a)(3) capital offense as charged in the indictment. The Defendant did rape Cheryl Lynn Payton and intentionally kill her, and he was not insane at the time he did so.
The aggravating circumstances that may be considered in sentencing are limited to those listed in Code of Alabama 1975, Section 13-11-6. The Court finds that four of them have been proven beyond a reasonable doubt and to a moral certainty, indeed, their existence was conceded by the defense at various times throughout the sentence proceeding before the jury.
The Section 13-11-6(1) aggravating circumstance does exist. When the Defendant committed the capital offense of raping and murdering Cheryl Lynn Payton on October 16, 1976, he was still under a twenty-year federal sentence of imprisonment he had received on March 14, 1966, for assault with intent to murder. He had been paroled on November 28, 1973, but for purposes of the Section 13-11-6(1) aggravating circumstance he was still, quote, under sentence of imprisonment, close quotes.
The Section 13-11-6(2) aggravating circumstance also exists. The Defendant was previously convicted of three crimes which involve violence to the person, and any one of them is sufficient to establish this aggravating circumstance. In 1966, he was convicted for assault with intent to murder, as has already been discussed. In 1981, he plead guilty to and was convicted of two first degree murders, the 1975 murder of Patricia Hitt and the 1976 murder of Venora Hyatt.
The Section 13-11-6(3) aggravating circumstance does not exist.
The Section 13-11-6(4) aggravating circumstances does exist. The capital offense involved rape. The Defendant murdered Cheryl Lynn Payton after raping her.
The Section 13-11-6(5) aggravating circumstance does not exist.
The Section 13-11-6(6) aggravating circumstance does not exist.
The Section 13-11-6(7) aggravating circumstances does not exist.
The Section 13-11-6(8) aggravating circumstance does exist. The Defendant did not suddenly kill Cheryl Lynn Payton without her having an opportunity to suffer the anticipation of her death at the hands of a murderer. Instead, the Defendant abducted her; he drove her to an isolated spot; because it was raining, he raped her in the cab of his pickup truck so he would not get wet; he marched the terrified victim out of the truck; and he shot her to death. Cheryl Lynn Payton knew that two other female convenience store clerks in Mobile had been murdered in the preceding year. She knew that the more recent victim had been abducted and that after she had been killed, her body had been mutilated. Cheryl Lynn Payton was afraid that she, too, would be abducted and murdered. As she was being abducted, as she was being taken to an isolated spot, as she was being raped, and as she was taken from the Defendant's truck, Cheryl Lynn Payton was terrified. She had reason to know that she was going to die long before the Defendant actually killed her. Considering all the circumstances, this capital offense was especially heinous, atrocious and cruel. The heinousness, atrociousness, and cruelty in this capital offense exceeded by far that which is present in every capital offense.
The statutory mitigating circumstances to be considered are set out in Code of Alabama 1975, Section 13-11-7. During the sentence hearing before the jury the Defense specifically requested that the Court not instruct the jury on Sections *Page 232 
13-11-7(1), (3), (4), (5) and (7) mitigating circumstances, thereby effectively conceding that those five statutory mitigating circumstances do not exist. In addition, the Court finds, independently of that concession, that Section 13-11-7(1), (3), (4), (5) and (7) mitigating circumstances do not exist. The evidence does not establish the existence of any of those five mitigating circumstances and instead establishes that they do not exist.
The parties vigorously disagree on the issue of whether the Section 13-11-7(2) mitigating circumstances exists, and the evidence is in conflict. After hearing all of the evidence, including but not limited to the expert testimony, and after considering all of the evidence carefully and making the necessary credibility decisions based on demeanor and other factors, this Court finds that the capital offense was not committed while the Defendant was under the influence of extreme mental or emotional disturbance. The evidence does not establish that that statutory mitigating circumstance exists, and in fact the evidence establishes that it does not exist. The Defendant was under some mental or emotional disturbance at the time of the crime, but it was not extreme. The fact that the Defendant was under some mental or emotional disturbance at the time of the crime, will be and is considered as a non-statutory mitigating circumstance.
The parties also vigorously disagree on the issue of whether Section 13-11-7(6) mitigating circumstance exists, and the evidence is in conflict. After hearing and considering all the evidence, both the expert testimony and the other evidence, and making the necessary credibility and other decisions to resolve the conflicts and after considering the demeanor of the witnesses, this Court finds that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired at the time of the crime. The evidence does not establish that that statutory mitigating circumstance exists. Instead, the evidence establishes that it does not exist. Contrary to the Defense contentions, the Defendant is not a paranoid schizophrenic or otherwise psychotic, and he was not at the time of the crime. He was suffering from "episodic discontrol" at the time of the crime.
The Defense has asked the Court to find that the Defendant has a long history of emotional and mental illness that contributed to the crime. The evidence does not establish that and instead establishes the contrary.
This does not mean that the Defendant is normal. He is and was schizoid, which means he is detached. That does not mean that he had no friends; he did have some. He got along well with some of his neighbors and co-workers. The Defendant is and was paranoid, which means he has persecutorial delusions. He also has necro-sadistic tendencies, which means he likes to cut up on or abuse dead bodies. He displayed those necro-sadistic tendencies when he returned to Cheryl Lynn Payton's body the day after he murdered her and cut on it with a knife. The rape and murder of Cheryl Lynn Payton was not caused by the Defendant's schizoid personality, or by his paranoid tendencies, or by his necro-sadistic desire. Nonetheless, the Court does and will consider those personality disorders as non-statutory mitigating circumstances and give them such weight as they deserve.
The evidence also establishes that the Defendant is a psychopath or criminal personality type. That means he does not abide by the laws of society and does not care about others. It is not a non-statutory mitigating circumstance.
The Defense has also asked the Court to find that the Defendant's disturbed childhood was a contributing factor to his commission of the crime. The evidence does not establish that conclusion, and the evidence establishes the contrary. This does not mean that the Defendant did not have what could be characterized as a disturbed childhood. He had an alcoholic father who was derided by his mother. His parents fought a lot. His mother was apparently overbearing. The evidence is that he slept in the same bed with his mother until he *Page 233 
was five years old and in the same room with her until he was about sixteen years old. All those specific details of the Defendant's childhood and the general circumstances of his childhood are and will be considered as non-statutory mitigating circumstances.
There is no evidence that the Defendant was sexually abused by his mother or father, and there is no credible evidence that he was ever sexually abused by anyone.
All of the Court's findings concerning the mental and emotional mitigating circumstances, both statutory and non-statutory, are based upon a consideration of all the evidence. However, the Defendant has a new trial motion pending concerning Dr. Rudder and certain undisclosed information concerning him which the Defendant contends impeaches Dr. Rudder's testimony. Indeed, much of the April 2, 1987 sentence hearing before the Court was taken up with evidence going to the new trial motion. The Court has not yet ruled on that new trial motion. However, out of an abundance of caution, the Court has considered all of the evidence minus the testimony of Dr. Rudder. The Court finds that all of its mitigating circumstance findings are the same even when Dr. Rudder's testimony is totally disregarded or assumed away. His testimony does not make any difference on any mitigating circumstance issue, and the total absence of Dr. Rudder's testimony would not change the resolution of any mitigating circumstance issue.
The Defense has asked the Court to find that the Defendant has made a good adjustment in prison since the commission of the crime. That is true, and that is a non-statutory mitigating circumstance which is and will be considered.
The Defense has also asked the Court to find that the Defendant, quote, aided the victim's family in their attempt to collect damages from the Federal Government for the negligent release of the Defendant from federal prison, close quote. That is true, and that is a non-statutory mitigating circumstance which is and will be considered. However, in determining how much weight to give this particular mitigating circumstance the Court notes that the Defendant's cooperation was not for purely humanitarian reasons nor was it motivated by genuine feelings of remorse. The Court finds that the Defendant has never felt genuine remorse, and his cooperation in the civil lawsuit came while he was awaiting resentencing. His cooperation was motivated by the hope and expectation that it would be considered his favor when he came to be resentenced. Those are the circumstances underlying this particular mitigating circumstance and weight due to be given it.
The Defense has also requested this Court to find as a non-statutory mitigating circumstance that the Defendant aided the Federal Bureau of Investigation in a study of violent murders. That is true, and it is and will be considered as a mitigating circumstance.
These are all the non-statutory mitigating circumstances Defense has asked this Court to consider. In addition, the Court has considered every aspect of the Defendant's character, and his record, and every circumstance of the crime that might call for a sentence other than death.
Having found the aggravating and mitigating circumstances, the Court now proceeds to weigh them against each other in order to determine sentencing. In doing so, the Court is aware that it is not bound by the jury's sentence verdict. The Court finds the four aggravating circumstances that exist in this case far outweigh all the mitigating circumstances and that the proper sentence is death.
Indeed, the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and to a moral certainty.
Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that Thomas Warren Whisenhant is guilty of the Code of Alabama 1975, Section 13-11-2(a)(3) capital offense of rape when the victim is intentionally killed, as charged in the indictment. *Page 234 
It is further ORDERED, ADJUDGED and DECREED that Thomas Warren Whisenhant is sentenced to death by electrocution. Pursuant to Alabama Rules of Appellate Procedure 8(d)(1), the date of the execution is to be set by the Alabama Supreme Court at the appropriate time.
Done this the 23rd day of April, 1987.
Now, Mr. — go ahead.
MR. CARNES: Judge, there was two things, I believe you may have misspoke. In regard to the sixth statutory mitigating circumstance, I understood everything until at the end you said he was suffering from episodic discontrol at the time of the crime, which was contrary to everything you'd said before. I believe what you meant to say is he or the Defendant was not suffering from episodic discontrol at the time of the crime.
THE COURT: He was not suffering is what I should have said, if I didn't say that.
MR. CARNES: Yes, sir. One other thing —
THE COURT: On page five. All right?
MR. CARNES: Yeah, that's fine.
The other thing was there was — Mr. Galanos has pointed out, I believe you misspoke one other point when you said that the evidence establishes that the Defendant is a — I believe you said psychopath, but you must have meant to say sociopath or criminal personality type.
THE COURT: I did.
MR. CARNES: Since you had previously said that he wasn't paranoid schizophrenic.
THE COURT: I did. What page is that on?
MR. CARNES: It's on my page seven, Your Honor, the top of my seven. I'm not sure — that was before the disturbed childhood contributing factor to the commission of the crime. No evidence he was sexually abused. There is something about sociopath and it comes right after —
MR. GALANOS: It's that paragraph, Your Honor, which reads, "The evidence also establishes that the Defendant is a sociopath or criminal personality type. That means he does not abide by the laws of society and does not care about others."
THE COURT: Isn't that exactly what I said?
MR. GALANOS: No, sir. My note reflects that you said psychopath as opposed to sociopath.
THE COURT: Well, I should have said sociopath.
MR. CARNES: That's all we have, Judge.
THE COURT: All right, the only thing left for me to do is rule on the motion for a new trial and I will do that within the next seven days based on everything that I've heard, and if either side wishes to submit to me a brief, fine, and I will issue an order within seven days.
MR. DEES: Your Honor, I'd like to state to the Court that the evidence we rely on is the evidence that came out at the hearing before the Court.
THE COURT: I realize that.
MR. DEES: And, Your Honor, on the question of attorneys' fees, the State has agreed that the attorneys' fee requests are reasonable, with the exception of Dr. — with the exception of Dr. Brown and we agreed by agreement just to collect the $2200.00 in the Court's previous order.
MR. CARNES: Which would be a reduction of $980.00.
MR. DEES: Well, I think he may bill the State for the time they spent with him. So, that's —
MR. CARNES: I understand that. That's no problem. Your Honor —
MR. DEES: And, Your Honor, the other —
MR. CARNES: I'm sorry. Are you through with the attorney fee part?
MR. DEES: No, sir. Give me a second.
MR. CARNES: Go ahead.
MR. DEES: The other question, Your Honor, when I first got in the case this last time I introduced Mr. Cohen and the Court said that he could enter the case pro hac vice and I —
THE COURT: No question about that. *Page 235 
MR. DEES: I knew that and I don't know whether we need a written order on that or not.
THE COURT: No.
MR. DEES: I didn't think so.
MR. CARNES: That's fine for everybody here concerned, but the comptroller is not as reasonable as Your Honor is. Before he will pay that, he will have to have an appointment for the people who he's paying.
THE COURT: Well, draw up an order —
MR. DEES: I'll draw up an order.
THE COURT: — and I'll sign it.
All right. Good day, gentlemen.