Billy Motes was tried on a two-count indictment charging him with the possession and sale of marijuana in the form of hashish in violation of the Alabama Uniform Controlled Substances Act. After pleading not guilty, he was tried, convicted and sentenced to three years in the State penitentiary.
The evidence presented by the State showed that on May 20, 1976, Glen Kilpatrick, an undercover narcotics agent for the North Alabama Drug Unit, and Mike Etheridge went to a house occupied by the Appellant, Billy Motes, and his wife. It was about 7:00 P.M., when the two arrived at the house. In response to their knock, the appellant's wife came to the back door, followed by her husband.
According to Kilpatrick, Etheridge asked appellant, "did he have anything to smoke." The appellant replied that he did not have any "pot" but did have some "hashish." They were invited in and Kilpatrick said they walked through the kitchen into the living room and sat down.
The appellant then went to the bedroom and returned with a small piece of tinfoil which he opened and handed to Kilpatrick. Kilpatrick, in turn, looked at it and handed it to Etheridge, who commented, "looks pretty good." The package was returned to Kilpatrick, who placed it in his pocket and gave the appellant a ten-dollar bill. Kilpatrick testified that the cost of the substance was seven dollars per gram and that the appellant gave him three dollars change. He went on to say, though, that there was only one-half gram in the tinfoil.
Kilpatrick recalled that after the sale they discussed making an additional purchase and were told to check back during the weekend. The two men left at the conclusion of the discussion and Etheridge drove Kilpatrick back to his car.
When Etheridge drove away, Kilpatrick placed the "hash" in a metal box which he kept in the trunk of his car. He stated that he alone had access to the metal box in his car and that the substance was later put in an envelope and turned over to Sgt. Bogus on May 25, 1976.
According to Kilpatrick, at the time he made the purchase, the appellant had hair over his shoulders and wore a beard. During the trial he made an in-court identification of the appellant and identified a picture depicting him with a beard and long hair, which he said accurately portrayed Motes as he appeared on May 20th when the sale was made.
Kilpatrick explained that the appellant's "green shingles type house" was located about two or three miles from New Hope, Alabama, at a place called Big Tree on Paint Rock Road.
During cross-examination, Kilpatrick testified that he made a case report after the arrest was made and in that report he described the appellant at the time of the arrest as being approximately six feet, seven inches tall and weighing one hundred and ninety pounds. Further, he said he was approximately twenty-two years old, was tall and slim, had long brown hair and wore a mustache and beard.
Although appellant's wife was not present during the sale, Kilpatrick described her as being about five feet, five inches tall and weighing approximately one hundred and twenty-five pounds, and having long, dark hair.
On further cross-examination, Kilpatrick described the living room and some of its contents, which was later contradicted by Motes' wife. He said that after entering the house through the kitchen, they remained in the living room for approximately twenty or twenty-five minutes.
Michael Joseph Etheridge testified that he was twenty-two years of age and had known Motes in New Hope, Alabama, since about the ninth grade.
According to Etheridge, on May 20, 1976, about 7:00 P.M., he and Glen Kilpatrick went to the appellant's house on Paint Rock Road. He described the house and stated that prior to that date he had gone there on numerous occasions but stated that he was not sure when Motes first began occupying the house. *Page 715 
Etheridge recalled that they knocked on the door of appellant's house and his wife, Diane, responded. They asked for the appellant and Motes came to the kitchen from the living room. According to Etheridge, they asked Motes, "did he have anything we could get high on, or something like that," to which Motes replied that "he didn't have no pot, he had some hash to sell." The appellant told them that the price was seven dollars per gram and went into a bedroom and returned with a gram of hash in a piece of tinfoil. Motes handed it to Kilpatrick who turned it over to Etheridge for his examination. Etheridge returned the tinfoil and its contents to Kilpatrick who paid Motes ten dollars. The appellant gave Kilpatrick three ones in change and said, "wait a minute, we'll smoke some." Etheridge testified that he said "no" that he had to pick up his wife and that they had to go.
Etheridge testified that during the time of the transaction the appellant's wife was not present and did not participate.
Further, he recalled that he and Kilpatrick remained in the house no longer than fifteen minutes. When they left they went out the back door and Etheridge drove Kilpatrick back to his car. Etheridge testified that he only looked at the substance in the living room and afterwards did not handle or touch it in any way.
On cross-examination, Etheridge testified that while in jail he had become acquainted with Officer Glen Kilpatrick. He was in jail on a charge of leaving the scene of an accident and he stated that he did receive some consideration on that charge for giving his assistance to the police. Etheridge said he was not sure whether the charge involved a misdemeanor or a felony but that the bond was three thousand dollars. Further, he related that he later plead guilty and received "60 days."
Etheridge admitted that he had smoked "pot" but said that he was not using drugs at the time of the transaction. He would not classify himself as a regular user of marijuana and stated that he had never used any other drugs, even though he had smoked marijuana once or twice a week during the past couple of years.
Sergeant Howard Bogus, of the North Alabama Drug Unit, testified that on May 25, 1976, he received some evidence in a brown manila envelope from agent Kilpatrick. Bogus said that he did not know what was in the envelope but made an in-court identification of the packet bearing his initials.
Bogus stated that at the time he received the packet it was sealed. He signed his name, put his initials on it and took it to the toxicology lab about 3:20 P.M. on May 25, 1976. There he gave it to Kim Gibson. According to Bogus, during the hour and twenty minutes that the envelope was in his possession, it did not leave his presence and no one else touched it.
Kim Gibson, employed by the State of Alabama, Department of Toxicology, as a Crime Laboratory Analyst II, in the Huntsville division, testified that on the afternoon of May 25, 1976, she received the manila envelope in question from Sgt. Bogus. She analyzed the material and determined the substance to be "the resin of marijuana." She explained that the substance is classified a resin and is generally extracted from crushed marijuana plant material. Further, she said that the resin of marijuana contained cannabinoids and through testing she had identified the substance as tetrahydrocannabinol.
Deputy Sheriff Terry Hutcheson worked in Madison County, and in November, 1976, was assigned to the intelligence unit. He testified that he had arrested the appellant on the present charge. At that time, Motes had a beard and shoulder-length hair. During the trial he identified a photograph that depicted the appellant on the day of his arrest. The arrest was made at the appellant's residence, a green, shingled house located on Paint Rock Road outside of New Hope.
At the end of Hutcheson's testimony, the State completed its case and, after the defendant's motion to exclude the State's evidence was overruled, the appellant testified in his own behalf. *Page 716 
Motes testified that on May 20, 1976, he lived in a house trailer approximately twenty miles from New Hope in Woodville, Alabama. Further, he said that a year prior to this time he and his wife had lived in Scottsboro.
According to Motes, he had moved to New Hope after his mobile home in Woodville was repossessed on June 28, 1976. He said that he and his wife had rented a "gray-siding house," belonging to a Mrs. Henry Graves, and had moved into the house the third or fourth week of June.
Motes denied seeing Etheridge and Officer Kilpatrick on May 20, 1976, and denied selling the hashish. He admitted that Etheridge had been to his house on numerous occasions but said that he was never accompanied by Officer Kilpatrick.
Motes further denied threatening Etheridge and said that he had never made any statement to Officer Kilpatrick or seen him before the day of the trial.
Motes testified that on May 20, 1976, he was at his trailer in Woodville, Alabama, and that his wife was working at Eckerds Drugs in Scottsboro. He said that he had never lived in a green shingled, house in New Hope, Alabama and that during May and June of 1976, his living room furniture was black vinyl.
Motes went on to testify that on May 20, 1976, he weighed about 150 pounds and had never weighed 190 pounds. The defendant indicated he could name at least ten people in the area that would fit his general description.
During cross-examination, Motes stated that in May of 1976, he owned a 1966 Nova automobile and that on November 20, 1976, he did not own an automobile.
Lorene Graves testified that in June, 1976, she rented a house to Billy Motes. She said that the appellant and his wife rented the house from her for about five months and that she had gone to the house on several occasions, sometimes at least three times a week unannounced.
During cross-examination, Mrs. Graves stated that she could not swear that it was June when the appellant moved in but that she did not really believe it was as early as May. She also testified that the house she rented to the appellant was a brownish-gray or something like that but was not green.
Willis Porter testified that he had known the appellant since February, 1974. He stated that in January, 1975, Motes' employment at Halstead Industries had been terminated and the union, of which he, Porter, was president, was arbitrating the matter. Further Porter said that Motes lived in Woodville and that it was sometime after the first part of June that the appellant's mobile home had been repossessed.
On cross-examination, Porter testified that from January, 1976, until May, 1976, while Motes was unemployed they had kept in touch by telephone. During this period Motes had said that he was living in Woodville but Porter said that he had never been to the appellant's trailer.
Clayton Cross, called as a character witness, stated that he had known Billy Motes for twenty-four years and that he had a fine reputation.
Appellant's wife, Diane Motes, testified that during 1975 and 1976, they were living in Woodville, Alabama and prior to that time they had lived in Scottsboro. She testified they were buying a trailer but after they had financial difficulties the trailer was repossessed in the latter part of June, 1976. She said it was after the trailer was repossessed that they moved to Mrs. Graves' house in New Hope.
Mrs. Motes stated that the house they lived in was not green but that it was gray with gray siding. She also said that she knew Mike Etheridge and that he had been to the house on many occasions but accompanied by his wife each time. Mrs. Motes denied ever seeing Officer Kilpatrick prior to the trial and said that she had not seen the officer and Mike Etheridge on May 20, 1976.
She went on to describe her living room furniture as being "black spanish" and that the only lighting in the living room was *Page 717 
located in the ceiling. Further she stated that there was an early American rocker and a small television in the living room. She said that the television was sitting on a wood spindle similar to the ones used by the telephone company to carry cable.
 I
Appellant alleges that the trial court erred in granting the State's challenge for cause of a venireman when it had not been shown that he was biased, or if biased, that such bias would affect the verdict he would be required to render.
During the voir dire examination of the jury venire, the State challenged for cause one member of the venire, and, after a defense objection, the court made the following inquiry:
. . . . .
 "THE COURT: Mr. Andrews, do I understand you to say that you will start out and count the witnesses per side and you are going to start out deadlocked and if there is three witnesses for each side at the end you are going to be deadlocked?
"A JUROR: There is a possibility.
 "THE COURT: I understand that, but I am asking if that's what you are telling us?
 "A JUROR: Unless the three could prove to me something that — other than the Defendant could.
 "THE COURT: Will you be able to listen to the testimony and listen to the evidence and weigh it and reconcile it and reach a decision based upon the evidence, that's without regard to numbers one way or the other? You will have evidence presented by each side and it will be the jury, the duty of the jury to take the instructions given by the Court and to weigh the testimony and to reconcile it and to consider it in the manner as instructed by the Court. And what I am trying to find out is if you can do that in arriving at a fair, true verdict in the case?
 "A JUROR: Well, depends on which one proves the most to me, which side.
 "THE COURT: Well, you are telling me that you can listen to the evidence and you can evaluate it and you can weigh it and consider it and render a verdict based upon the totality of the evidence?
"A JUROR: It's possible.
 "THE COURT: No. In order to sit on the jury, Mr. Andrews, for both sides, you must be able to do that, not enter into it with the possibility that you can do it, because if there is a possibility you can't do it you perhaps ought not to be on the case, you see.
 "A JUROR: It's a possibility that I could not do it, Judge.
 "THE COURT: All right. There was another reason or previously stated that — what was that? Not by Mr. Andrews, not having to do with the witnesses.
 "MR. ACARDI: He stated he would be strongly — stated he would be strongly against —
 "THE COURT: There was some other reason that I had marked with a question mark and I have forgotten what it was.
 "MR. ACARDI: Mr. Andrews stated that he was very strong against drugs.
 "THE COURT: So, that it appears to be some reason why he might not be fair to the Defendant and also it may be that so based upon the possibility that he — I am going to grant that challenge for cause in fairness to both of you. You and the other side, because I am not sure that he really understands what he enters into. And plus he has stated that he is opposed very hard on drugs.
 MR. MORRIS: We object to the Court's ruling. He also stated that possibly his sitting on this jury could be beneficial to the Defendant.
 "THE COURT: He also said possibly he couldn't even render a verdict in the case. He said he possibly could not listen to the evidence objectively in accordance with the instructions of the Court and I grant the challenge for cause.
"MR. MORRIS: We except to the Court's ruling.
"THE COURT: I am going to excuse you from this panel. *Page 718 
"A JUROR: Thank you, Sir."
The grounds for disqualification of jury veniremen for cause are enumerated in T. 30, § 55, Code of Alabama 1940, Recompiled 1958. However, these are not exclusive and any other ground which indicates probable prejudice will also disqualify.Pointer v. State, 24 Ala. App. 23, 129 So. 787.
The trial judge is given much discretion under T. 30, § 5, in an attempt to insure an unbiased jury. Such discretion is not confined to the grounds enumerated in T. 30, § 55, supra.Cooper v. Magic City Trucking Service, 288 Ala. 585,264 So.2d 146; Mutual Building Loan Association v. Watson, 226 Ala. 526,147 So. 817. Where probable prejudice is indicated for any reason, a prospective juror is disqualified. Grandquest v.Williams, 273 Ala. 140, 135 So.2d 391.
It is a fundamental rule that parties have a right to an impartial jury. Great care should be exercised to guarantee the accused constitutional right to a fair trial by an impartial jury. Wilson v. State, 243 Ala. 1, 8 So.2d 422.
Mr. Justice Waite, in writing for the United States Supreme Court, in Reynolds v. U.S., 98 U.S. 145, 25 L.Ed. 244, observed:
 "A juror to be impartial must to use the language of Lord Coke, `be indifferent as he stands unsworn . . .' It is clear . . . that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and the strength of the opinion as such as in law necessarily raises the presumption of partiality. . . . The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest."
The decision of a trial court to disqualify a venireman based on a challenge grounded on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an erroneous abuse of discretion. Mims v. Mississippi Power Co.,282 Ala. 90, 209 So.2d 375; Acoff v. State, 50 Ala. App. 206,278 So.2d 210; Smithson v. State, 50 Ala. App. 318,278 So.2d 766.
Appellant asserts that the bias of the venireman was not supported by the foregoing portion of the record. We note that during the colloquy between the attorneys and the court that the prosecution stated that Andrews "was very strong against drugs" and ". . . granting the challenge for cause the trial judge stated that in fairness to both the defense and the prosecution he would excuse the venireman because he had stated, "it's a possibility . . ." that he could listen to the evidence objectively and render a fair verdict.
The court did not abuse its discretion in granting the challenge for cause and that decision will not be disturbed on appeal. It cannot be said that from the record the venireman, as he stood unsworn, was indifferent.
 II
It is next contended that the trial court was in error when it permitted a photograph of the defendant made at the time of the arrest to be placed into evidence. Appellant argues that the photograph had a prejudicial effect on the jury and no relevancy at all on the issue of identity of the defendant. The inflammatory nature of the photograph is alleged to be that it depicted the defendant with long hair and a beard at the time of the arrest, when at the trial he appeared with short hair and no beard. This, appellant claims, is highly prejudicial.
In support of this contention the appellant is relying on VanNostrand v. State, 51 Ala. App. 494, 286 So.2d 903; Boyd v.State, 50 Ala. App. 394, 279 So.2d 565, and Chamberlain v.State, 46 Ala. App. 642, 247 So.2d 683.
Each of these cases is distinguishable from the case at bar on the issue of identity.
In Van Nostrand v. State, supra, the defendant's identity was not in issue. Van *Page 719 
Nostrand claimed that although he was present during the sale of the narcotics he never had the envelope in his possession prior to the time of the sale and he did not know that it contained heroin. In Boyd v. State, supra, defendant, charged with shooting the victim with a pistol, entered a plea of not guilty by reason of insanity. The facts in that case indicated that the defendant was a passenger in a car at the time the victim who was traveling in another car was shot. The occupants of the defendant's car testified that a shot was fired from their car and that the defendant was the only one in possession of a pistol. Appellant himself confessed that he fired the gun in the direction of the victim's car to scare him. Under these facts, no question of identity was presented.
We also distinguish Chamberlain v. State, supra, because the facts indicate that the question of identity was not presented. Chamberlain did not testify and two robbery victims positively identified him in an in-court identification. A lineup photograph introduced by the State without dispute had no tendency to prove or disprove any material fact in issue.
In this case the appellant's identity was in issue. In his testimony he asserted that he had not sold the substance, was not living in the house where the sale took place and had never seen the undercover agent or the informant on the night in question. Further, he stated that he was in a mobile home in another city on the night of the sale and that there were at least ten other individuals that he knew of in the town of New Hope that met his general description. In our judgment, this is a classic case where the appellant's identity was in fact an issue.
Dispositive of this issue by appellant is the opinion inShiflett v. State, 52 Ala. App. 476, 294 So.2d 444. There this court was faced with a factual situation very similar to the one presented in the case at bar. Shiflett had been convicted for selling marijuana. The photograph introduced by the State was taken of him on the day of his arrest and he had emphatically denied selling the drug. This court said that, due to the appellant's obvious change of appearance at the time of the trial from the date of the arrest, the photograph had a tendency to prove the material fact of identity.
 III
During the trial, objection was made to the introduction of State Exhibit # 1, the package of "hashish," on the grounds that a chain of custody had not been established.
A review of the testimony by Officer Kilpatrick reveals that after he received the hashish from the appellant, he placed the substance in a locked box that was then placed in the trunk of his car. Nothing else was in the box and Kilpatrick testified that only he had access to the trunk and the box. The hashish remained in their until it was turned over to Officer Bogus five days later.
The factual circumstances surrounding the handling of the physical evidence in the present case is very similar to the facts presented in Mullins v. State, 56 Ala. App. 460,323 So.2d 109. There an undercover agent bought some marijuana from the appellant and placed it in his pocket and after returning to his motel room, sealed it in an envelope. The envelope remained in the motel room until noon the next day when it was turned over to another officer. That officer then placed it in another envelope which he locked in the trunk of his car where it remained for five days before it was delivered to a State toxicologist. This court in upholding the admissibility of the evidence determined:
 "The evidence as to the custody and possession of the envelope and its contents sufficiently established there was no missing link in the chain of identification. The identification and continuity of possession were sufficiently shown, affording ample assurance of the authenticity of the envelope and its contents and the analysis conducted by the toxicologist."
See Powell v. State, 47 Ala. App. 582, 258 So.2d 923; Green v.State, 42 Ala. App. 439, *Page 720 167 So.2d 694; Dennison v. State, 259 Ala. 424, 66 So.2d 552;Oury v. State, 53 Ala. App. 240, 298 So.2d 661.
From the facts presented it is evident that the continuity of possession was sufficiently shown and the trial court properly admitted the exhibit.
 IV
The appellant insists that the refusal of the following requested instruction on alibi was error.
 "Ladies and gentlemen of the jury, the Defendant in this case has set up a defense of alibi, saying that he could not have committed this offense because he was somewhere else at the time the offense was committed. The Defendant has no burden of proof whatsoever in establishing his alibi."
The law is well settled that where the substance of a charge was fairly and substantially covered by the oral charge the refusal of the special written charge was not error. Williamsv. State, 21 Ala. App. 319, 108 So. 84.
We have reviewed the court's oral charge and have found that it was substantially covered when the court gave the following instruction:
 "The defendant has entered his plea of not guilty in the case and he has testified that he was not present and if the jury believes that he was not present then or if you otherwise have a reasonable doubt concerning his guilt, it is equally your duty to acquit him and in that event the form of your verdict would be, `We, the Jury, find the Defendant not guilty.'"
We have searched the record for error and having found none, the judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.