The appellant was convicted of the capital offense of murder during a robbery in the first degree, in violation of §13A-5-40(a)(2), Code of Alabama (1975). Following a sentencing hearing, the jury recommended a sentence of death by vote of 12 to 0. The trial court ordered a presentence investigation, and, after complying with § 13A-5-47, Code of Alabama (1975), the trial court sentenced the appellant to death by electrocution.
The appellant, who often worked as a free lance artist, was hitchhiking in the vicinity of Tucson, Arizona, when he was given a ride by Donald Hendron. Hendron told the appellant that he was working for the E.H. Gentry School in Talladega, a state facility for the deaf. It was then arranged that the appellant would be employed at the facility. Subsequently, the appellant moved to Talladega to work for the school in return for free meals. He lived with Hendron until the appellant began seeing a deaf woman who was a student at the facility. Hendron discussed the possible repercussions of the appellant's relationship, as an employee of the facility, with the student and decided to move out *Page 588 
of their apartment; however, the appellant remained a resident.
On February 19, 1986, the appellant ate lunch at the apartment of a neighbor, Stephen Laney, with Laney and Laney's girl friend, Linda Odom. After lunch, Laney left for approximately an hour to get his car, and when he returned to his apartment, neither Linda Odom nor the appellant was there. Laney knocked on the appellant's door and, approximately 15 minutes later, the appellant came to the door. He then accompanied Laney to look for Linda Odom. Thereafter, the appellant asked Laney for a ride to the apartment of his girl friend, Sherry Weathers. After Laney dropped him off, the appellant spent some time at his girl friend's apartment, where the victim, Linda Jarman, was apparently also present. Linda Jarman, who was also deaf, was a teacher at the E.H. Gentry School and knew the appellant through her work there and because she lived next door to his girl friend, Sherry Weathers.
Linda Jarman owned a yellow 1973 Buick automobile, which the appellant borrowed with her permission. He then drove back to his apartment, where Stephen Laney observed him carry large green trash bags downstairs. The appellant told Laney that he had borrowed his girl friend's automobile and was returning some of her "stuff" because they had had a fight. The appellant returned to Sherry Weathers's apartment, where he spent some time. Upon leaving that apartment, he walked next door to Linda Jarman's apartment. He spent an hour or two there, drinking wine with her. They then went into the bedroom, partially clothed, and lay down upon the bed, where he murdered her by strangling her. He then took her stereo and her car and fled Talladega. Approximately 13 days later, Linda Jarman's automobile was found with a flat tire, abandoned on the side of a highway in Kentucky. A camp site was discovered off the highway and in the vicinity of the abandoned automobile. Evidence linking the appellant to the site was also found. He was thereafter apprehended in Tennessee.
During the week-long trial, the State called or recalled over 40 witnesses and introduced 147 exhibits. The appellant had given a statement implicating himself in several murders; the State introduced that portion of the statement dealing with the murder of Linda Jarman.
 I
The appellant argues that the trial court erred in overruling his motion for funds for appointment of an expert to assist in the preparation of his motion for change of venue. While the instant case concerns the appellant's charge of the capital murder of Linda Jarman, he was also charged with the murders of four other people in the city of Talladega, two of the four being children. The appellant argues that because of the nature of the offenses, the extensive publicity surrounding the case, and the fact that he was indigent, he should have been allowed the funds which he requested from the court to hire an expert. The appellant further submits that the trial court erred in denying his request to allow the venire to fill out a questionnaire anonymously, because, the appellant argues, the venire would have answered questions more candidly in private.
In Duren v. State, 507 So.2d 111 (Ala.Cr.App. 1986), affirmed,507 So.2d 121 (Ala. 1987), cert. denied, Duren v. Alabama,484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987), the defendant argued that he was denied due process of law because the State refused to provide him with reasonable funds to employ experts, among them a polling expert to aid in the presentation of a motion for change of venue and a motion for individual questioning of jurors. This court held that the denial of funds to employ such an expert was proper, id., at 119, citing Exparte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), wherein the Alabama Supreme Court wrote:
 "Did the statutory limit on state-provided funds for expenses prevent defendant from proving actual prejudice in the community at large, and thus cause him to lose his request for change of venue? *Page 589 
 " 'The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination,' Anderson v. State, 362 So.2d 1296, 1299
(Ala.Crim.App. 1978), not through extensive and expensive surveys. It costs nothing to question the prospective jurors; thus the limit on available funds cannot be said to have prevented defendant from showing actual prejudice of the jurors."
The record indicates that the potential jurors were questioned in three panels, the first consisting of 22 jurors. Although the record does not state the number of jurors on the next two panels, assuming the panels were of equal size, there were 66 people on the venire. Twenty-one of these veniremen stated that they had heard of the case. Three venire members, who indicated that they believed they would be unable to give the defendant a fair trial because of preconceived notions of guilt, were excused for cause. All other potential jurors who indicated that they had previously heard of the case stated that they could set aside any preconceived feelings and give the appellant a fair trial according to the evidence and the trial court's instructions. Furthermore, during a discussion between defense counsel and prosecutor at the close of the motion for change of venue, the attorneys acknowledged that all potential jury members who had stated that they had read, seen, or heard anything about the case were all eventually struck from the jury.
Newspaper articles, as well as videotapes of newscasts, concerning this case, were introduced into evidence at the motion for change of venue. We have reviewed these exhibits and find that they are factual accounts of the case and contain no prejudicial or inflammatory material. Police officials testified that news conferences were held to divulge the progress of the investigation to the press, but that no evidence from the case was ever related.
The defense lawyers presented evidence of the amount of coverage which the case received. They also thoroughly examined the potential jurors during the voir dire. From the evidence presented, there is no indication that a polling expert could have helped the appellant on this motion, nor is there any indication of abuse of discretion by the trial court in denying the appellant's motion for change of venue. "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794,799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975)." Exparte Grayson, supra.
 "[T]he fact that even a majority of the prospective jurors had preconceived notions of the guilt of the accused does not require a change of venue where there is evidence that the jurors would be able to lay aside their impressions or opinions and render a verdict based on the evidence presented in court. Callahan v. State, 471 So.2d 447, 452 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Callahan, 471 So.2d 463
(Ala. 1985). 'The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847
(1984).
 "The trial court's findings of impartiality should be overturned only for 'manifest error.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)."
Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App. 1988). We also find no evidence of an inherently prejudicial climate that would prevent the appellant from receiving a fair and impartial trial. Robinson v. State, 430 So.2d 883 (Ala.Cr.App. 1983).
Furthermore, while the evidence of press coverage submitted by the appellant contained only factual reports of the progress of the investigation and the announcement of the upcoming trial, the majority of the articles were released between the time of the crime in February 1986 and the appellant's arrest in September 1986. The trial did not begin until March 1987. " '[T]he passage of time cannot be ignored as a factor in bringing objectivity to trial.' " Whisenhant v. State,555 So.2d 219 (Ala.Cr.App. 1988), *Page 590 
quoting Dannelly v. State, 47 Ala. App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971). See alsoMurphy v. Florida, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037,44 L.Ed.2d 589 (1975).
Error did not result from the trial court's denial of the appellant's motion for funds for an expert. The appellant's status as an indigent does not require the State to provide him with a polling expert. The Alabama Supreme Court wrote the following concerning the United States Supreme Court's decision in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 LEd.2d 53
(1985).
 "[T]here is nothing contained in the Ake decision to suggest that the United States Supreme Court was addressing anything other than psychiatrists and the insanity defense. Certainly, that decision cannot be broadly interpreted to require a State to provide experts of any category of a defendant's own chosing to assist him in preparing whatever defenses he chooses. We have been cited to no other authority requiring such appointments." Ex parte Grayson, 479 So.2d at 82.
Moreover, this court in Duren v. State, supra, noted that, even if the principles of Ake apply to anything other than psychiatrists and the insanity defense, the trial court did not commit error in denying that defendant's motion for funds to employ experts. Likewise, because the voir dire examination disclosed little prejudicial influence of pre-trial publicity, the appellant in the present case has not shown a need for such an expert, and the trial court did not commit error under Ake.
Last, the trial court did not err in failing to allow the appellant to have the venire anonymously fill out a questionnaire. The appellant was allowed to ask any and all questions contained in the questionnaire. The method of qualifying a jury on voir dire is a matter largely vested in the discretion of the trial court. Seals v. State, 282 Ala. 586, 213 So.2d 645, 657-58 (1968); United States v. Hurley,746 F.2d 725 (11th Cir. 1984). See also Beecher v. State, 288 Ala. 1, 256 So.2d 154, 164 (1971), reversed on other grounds,Beecher v. Alabama, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317
(1972) ("[t]he defendant was not entitled to examine each prospective juror outside the presence of the other jurors").
 II
The appellant argues that the trial court erred in overruling his motion for change of venue. However, the appellant has the burden of showing to the reasonable satisfaction of the trial court that a fair and impartial jury cannot be had and that an unbiased verdict cannot be reasonably expected. Anderson v.State, 362 So.2d 1296, 1298 (Ala.Cr.App. 1978).
 "Except in the situation where there is a showing of 'inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors', the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial."
Anderson v. State, supra, at 1298-99, and cases cited therein.
As noted in the previous issue, neither the voir dire of the venire nor the evidence of the media coverage of the case indicates that the trial court abused its discretion in denying the motion for change of venue. "In reviewing the evidence presented in this cause, we find that the appellant did present evidence of news media and widespread publicity of this matter. However, we find no evidence of an inherently prejudicial climate that would prevent this appellant from receiving a 'fair and impartial trial.' " Whisenhant v. State,555 So.2d 219 (Ala.Cr.App. 1988).
 III
The appellant argues that the trial court erred in admitting the appellant's statement into evidence because theMiranda warning given the appellant was improperly worded. Specifically, the appellant argues that because the detective who *Page 591 
informed the appellant of his Miranda rights prior to his making his statement stated that "anything you say can be used against you in court", instead of "anything you say can and will be used against you," his confession was inadmissible.
The record indicates that the appellant, upon his arrest, was informed of his rights by use of a Miranda card, kept by Captain Hurst of the Talladega Police Department, which used the "can and will be used against you" language. Approximately 30 minutes later, upon his arrival at the Humphreys County, Tennessee, jail, the appellant was again advised of his rights, through the use of a form supplied by the Humphreys County sheriff. That form stated:
 "You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one. And if you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."
This difference in wording, between "anything you say can and will be against you in a court of law" and "anything you say can be used against you in court", does not render the appellant's confession inadmissible. In California v. Prysock,453 U.S. 355, 359-360, 101 S.Ct. 2806, 2809-2810,69 L.Ed.2d 696 (1981), the United States Supreme Court stated:
 "This Court has never indicated that the 'rigidity' of Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] extends to the precise formulation of the warnings given a criminal defendant. See e.g., United States v. Lamia, 429 F.2d 373, 375-376 (CA. 2), cert. denied, 400 U.S. 907 [91 S.Ct. 150, 27 L.Ed.2d 146] (1970). This court and others have stressed as one virtue of Miranda the fact that the giving of the warnings obviates the need for a case-by-case inquiry into the actual voluntariness of the admissions of the accused. See Fare v. Michael C., 442 U.S. [707], at 718 [99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)]; Harryman v. Estelle, supra
[616 F.2d 870 (5th Cir. 1980)]. Nothing in these observations suggests any desirable rigidity in the form of the required warnings.
 "Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by defendant.' 384 U.S., at 476
[86 S.Ct., at 1629] (emphasis supplied). See also id., at 479 [86 S.Ct., at 1630]. Just last Term in considering when Miranda applied we noted that the decision announced procedural safeguards including 'the now familiar Miranda warnings . . . or their equivalent.' Rhode Island v. Innis, 446 U.S. 291, 297 [100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980) (emphasis supplied)."
This court has followed the language in California v.Prysock, supra, in holding that Miranda does not require specific language concerning the constitutional rights protected by Miranda. See Jones v. State, 456 So.2d 366
(Ala.Cr.App. 1983), affirmed, 456 So.2d 380 (Ala. 1984), cert. denied, Jones v. Alabama, 470 U.S. 1062, 105 S.Ct. 1779,84 L.Ed.2d 838 (1985).
 "Reviewing the language used to inform the appellant herein of his right to appointed counsel, we find, as did the court in Prysock, supra, that '[t]his is not a case in which the defendant was not informed of his right to the presence of an attorney during questioning . . . or in which the offer of an appointed attorney was associated with a future time in court. . . .' Prysock, [453 U.S.] at 361, 101 S.Ct. at 2810
(Citations omitted.)"
Jones v. State, supra, at 373.
The appellant also asserts that his statement should not have been allowed into *Page 592 
evidence because it was involuntary, as it was conditioned on the detective's promise that the appellant would not be asked certain questions. Specifically, he submits that the detective told him he would not ask questions concerning "details." Captain Hurst, of the Talladega Police Department, testified that when he spoke to the appellant, while still in Tennessee, the appellant stated that he would give Captain Hurst an admission of guilt concerning the homicides at that time, but that he would not go into details until he got back to Alabama. Captain Hurst further testified that he told the appellant that such an arrangement would be fine. The appellant argues that this arrangement constituted a "promise" which would make his statement involuntary. However, this arrangement was not a promise made by Captain Hurst in order to induce the appellant to give a statement, but was rather a condition set by the appellant, which Captain Hurst accepted.
"The test for voluntariness is whether, in light of the totality of the circumstances, the government obtained a confession by coercion or improper inducement. The factual inquiry into voluntariness focuses on the conduct of the law enforcement officials." "Project: Fourteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1983-84," 73 Geo.L.J. 382-83 (1984). In Townsend v.Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770
(1963), the United States Supreme Court stated that "[n]umerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced." The types of promises which may make a defendant's statement involuntary are, e.g., promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, the disclosure of incriminating evidence to the accused, and silence in response to the defendant's offer to talk if his statement will not be used against him. 73 Geo.L.J. at 383-84. Furthermore, a statement "is not rendered involuntary by a promise or benefit that was solicited freely by the defendant himself." Rowe v. State, 421 So.2d 1352, 1355
(Ala.Cr.App. 1982), citing Eakes v. State, 387 So.2d 855
(Ala.Cr.App. 1978).
Captain Hurst testified that neither he nor anyone in his presence made any threats, promises, inducements, offers of reward, or remuneration to the appellant in order to obtain a statement. The appellant's confession was not the product of a direct or implied promise. The conditions established by the appellant for giving his confession did not induce his statement. The record indicates that, during the statement, when Captain Hurst asked a question which the appellant thought asked for details, Captain Hurst withdrew the question and the appellant completed his statement. The trial court properly admitted the offered portions of the appellant's statement into evidence.
 IV
The appellant argues that the trial court erred in overruling his motion to exclude the State's evidence, because, he argues, that the State failed to prove the element of robbery in the first degree. The appellant argues that the evidence failed to prove that he committed the murder in order to take the victim's automobile; and failed to prove that he committed robbery, because, he says, the evidence showed that the victim had allowed the appellant to borrow her automobile prior to her death. Thus, the appellant argues that he did not intend to commit robbery; that he did not commit the murder in order to commit the robbery; and, because he had borrowed the victim's automobile, he says, he did not commit robbery.
Robbery in the first degree is defined by § 13A-8-41, Code ofAlabama (1975):
 "(a) A person commits the crime of robbery in the first degree if he violates § 13A-8-43 and he:
 "(1) Is armed with a deadly weapon or dangerous instrument or *Page 593 
"(2) Causes serious physical injury to another."
Section 13A-8-43, Code of Alabama (1975), defines robbery in the third degree as follows:
 "(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 "(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
 "(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
Theft of property is defined by § 13A-8-2, Code of Alabama
(1975), as follows:
 "A person commits the crime of theft of property if he:
 "(1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property; or
 "(2) Knowingly obtains by deception control over the property of another with intent to deprive the owner of his property."
(Emphasis added.)
The element of intent to rob was a question for the jury and, therefore, the appellant's motion to exclude was properly denied. See e.g., Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988); Harrell v. State, 470 So.2d 1303, 1307
(Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276, (1985) (intent is a question for the jury.) The evidence at trial, including the appellant's confession, showed that the appellant strangled Linda Jarman to death, took her automobile, left the state in it, and abandoned it along an Interstate highway in Kentucky. His fingerprints were found in the car, as was the key to his apartment in Talladega. A camp site, littered with numerous items linked to the appellant, including his birth certificate and a letter to his mother, was found near the abandoned automobile. Furthermore, the appellant's neighbor testified that, after the appellant had borrowed the victim's car, he returned to his apartment, where he informed his neighbor that he had borrowed his girl friend's car. His neighbor then observed him taking out a number of large trash bags, which the appellant stated were filled with some of his girl friend's "stuff" which he was taking back to her. From this evidence, the jury could have reasonably concluded that the appellant intended to take the victim's automobile in order to leave town. The fact that the appellant contends that he did not intend to rob the victim of her automobile made the issue a question for the jury. Travis v. State, 484 So.2d 1148, 1150
(Ala.Cr.App. 1985); Odom v. State, 348 So.2d 277, 282
(Ala. Cr. App), cert. denied, 348 So.2d 282 (Ala. 1977).
Moreover, although the appellant argues that the State failed to prove robbery, because of his contention that he had permission to borrow the car, the jury could have reasonably concluded from the evidence that the appellant exercised unauthorized control of the vehicle. A writing pad was introduced into evidence, which was found at Sherry Weathers's residence and which contained a message, written by his girl friend, stating: "Daniel came by here. He will be back. He used Linda's car." Thus, the jury could have concluded that the appellant was to bring the vehicle back and was not given authority to leave the state in the vehicle or to abandon it on the side of an Interstate highway in Kentucky 13 days later. The crime of theft of property clearly includes the exertion of "unauthorized control over the property of another, with intent to deprive the owner of his property." § 13A-8-2, Code ofAlabama (1975). One of the definitions of "deprive" stated under § 13A-8-1, Code of Alabama (1975), is: "To dispose of the property so as to make it unlikely that the owner would recover it." Thus the evidence supports the jury's finding that the appellant intended to deprive Linda Jarman of her automobile and exerted unauthorized control of the automobile. See Deep v.State, 414 So.2d 141, 148-49 (Ala.Cr.App. 1982). *Page 594 
Finally, the State sufficiently proved that Linda Jarman was killed during the commission of the robbery. "The crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob in culminating with the act of intentionally killing the victim." Magwood v. State, 494 So.2d 124, 148
(Ala.Cr.App. 1985), affirmed, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599,93 L.Ed.2d 599 (1986). The term "during" is defined by §13A-5-39(2), Code of Alabama (1975), as "in the course of or connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." "[T]hus, even if the appellant took the victim's property when he was in 'immediate flight after the attempt or commission,' his actions were still embraced within the statutory scheme for murder committed during a robbery." Davis v. State,536 So.2d 110 (Ala.Cr.App. 1987), affirmed, 536 So.2d 118 (Ala. 1988). See also Hallford v. State, supra.
The trial court properly overruled the appellant's motion to exclude, as there was sufficient evidence to submit the case to the jury.
 V
The appellant argues that the trial court erred in allowing the prosecutor to question witnesses about victims in other crimes for which the appellant was indicted. Specifically, the appellant argues that it was error to allow the district attorney to ask a witness, "Did you know a lady by the name of Sherry Weathers during her lifetime?" The appellant argues that this question insinuated to the jury that Sherry Weathers was dead, which information was highly prejudicial in that the evidence showed the victims to be neighbors and to have both been present with the appellant on the night in question. The record indicates that the defense counsel filed a motion in limine requesting that the prosecution and the State's witnesses refrain from any mention of any other criminal activity on the part of the appellant. The appellant was also charged with the murders of his girl friend (Sherry Weathers) and her two young sons, those murders allegedly having occurred on the same night as the instant offense, just prior to his strangulation of Linda Jarman. The appellant was also charged with the murder of his neighbor Steve Laney's girl friend, that murder allegedly having also occurred the same day. However, the capital case against the appellant for the murders of his girl friend and her sons had not yet commenced at the time of the trial in the instant case.
A hearing was held on the appellant's motion in limine, in which the prosecutor stated that the State did not intend to go into such matters during the guilt phase, unless the appellant took the witness stand. The prosecutor, however, indicated that the other offenses "may become material as to the intent of the defendant in taking Linda Jarman's automobile." The prosecutor agreed not to bring up the other offenses until he had attempted to admit the appellant's statement into evidence. The trial judge ruled that the prosecutor should not mention the other offenses during his opening statement and that he would withhold his ruling until the proper time.
As a preliminary question during the direct examination of an employee of a food mart, which was located close to the victim's apartment, the prosecutor asked the witness whether he knew Linda Jarman. He then asked if the witness knew the appellant's girl friend "during her lifetime", and the witness answered affirmatively. It was subsequently revealed that the appellant, Linda Jarman, and his girl friend had been seen together by the witness on the day in question, the witness being one of the last people to see Linda Jarman alive.
We need not determine whether the murders of the appellant's girl friend and her children were admissible under an exception to the exclusionary rule, because we do not find that the prosecutor's question of the witness introduced evidence of any collateral offense. By asking the witness whether he knew the appellant's girl friend "during her lifetime," the prosecutor insinuated *Page 595 
to the jury that the appellant's girl friend was dead, but in no way did the question indicate that the appellant had anything to do with her death. Moreover, it was not error to disclose to the jury that the appellant's girl friend was no longer alive, because this court has held that the State may inquire of a witness whether a party, who is known to have been in the presence of the victim close to the time of the offense, is living or dead, in order to explain his or her absence.Collins v. State, 115 So. 223, 217 Ala. 212 (1928).
The appellant was not prejudiced by the prosecutor's question. The question did not indicate how the appellant's girl friend died, nor did it connect the appellant in any way with her death. Therefore, the trial court properly allowed the prosecutor to ask the question.
 VI
The appellant argues that the trial court erred in overruling his challenge of a juror who allegedly thought that the appellant was guilty and a juror who had heard that the appellant was charged with the murder of some children.
The following transpired during the voir dire examination of one of the potential jury members:
 "[DEFENSE COUNSEL]: You said earlier you think he is probably —
 "JUROR BETTY CHANDLER: (Interrupting) Well, I shouldn't have said that. Because I think I could be fair. I mean, you know, how you read, and you think guilty. I never questioned it, but I think I could be fair.
 "[DEFENSE COUNSEL]: Okay, you said a minute ago, I believe that question was, and I might be mistaken, but I believe it was, did you think the defendant was probably guilty or was probably innocent. Which one were you leaning towards there, a little bit?
"MRS. BETTY CHANDLER: I was thinking guilty.
 "[DEFENSE COUNSEL]: Probably guilty. Okay. Do you know of any reason you couldn't give the defendant a fair trial?
"MRS. CHANDLER: No, sir.
 "[DEFENSE COUNSEL]: Do you think you could put that out of your mind, even though today, or at some time in the past you thought he was probably guilty?
"MRS. CHANDLER: Yes, sir."
Subsequently, the defense counsel challenged juror Betty Chandler. The following transpired:
 "THE COURT: The question is this. Lawyers ask question in all kinds of ways. But I'll direct this question to you. And it has to be answered yes or no. Do you have a fixed opinion as to the guilt or innocence of the defendant that would bias your verdict assuming you were chosen to sit on this case?
"JUROR CHANDLER: No.
"THE COURT: I'll overrule the challenge."
"To disqualify a prospective juror, he must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. Such opinion must be so fixed as that it would bias the verdict a juror would be required to render. Hammil v.State, 90 Ala. 577, 8 So. 380." McCorvey v. State,339 So.2d 1053, 1057 (Ala. Cr. App), cert. denied, 339 So.2d 1058
(Ala. 1976). "A 'fixed opinion' which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force." Nobis v. State,401 So.2d 191, 197 (Ala. Cr. App), writ denied, 401 So.2d 204 (Ala. 1981).
 "[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence. See Sparks v. State, 450 So.2d 188 (Ala.Cr.App. 1984); Clark v. State, 443 So.2d 1287 (Ala.Cr.App. 1983); Gwin v. State, 425 So.2d 500 (Ala.Cr.App. 1982), writ quashed, 425 So.2d 510
(Ala. 1983). Further, . . . a trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear *Page 596 
showing of an abuse of discretion by the trial court. See Price v. State, 383 So.2d 884
(Ala. Cr. App), cert. denied, 383 So.2d 888
(Ala. 1980); Motes v. State, 356 So.2d 712
(Ala. Cr. App), cert. denied, 356 So.2d 720
(Ala. 1978)."
Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala. 1988).
Juror Betty Chandler gave adequate assurances that she could set aside any opinion of guilt which she might have had and that she could give the appellant a fair trial. Clearly, her opinion was not so "fixed" that her mind was closed on the case and the evidence.
The appellant also argues that the trial court erred in denying his challenge of Juror Smith for cause. The following transpired during the voir dire questioning:
 "[DEFENSE COUNSEL]: Based on what you saw or read or what you discussed with somebody, what do you think happened? What do you think about it?
 "JUROR SMITH: Well, I think it was a terrible thing.
"[DEFENSE COUNSEL]: What is so bad?
 "JUROR SMITH: Well, with the children part of it, because I have got two small children at home.
 "[DEFENSE COUNSEL]: So, you have heard that the defendant was charged with killing some children?
"JUROR SMITH: Yes.
 "[DEFENSE COUNSEL]: Based on that, would you have a hard time sitting as a juror?
"JUROR SMITH: Probably so.
 "[DEFENSE COUNSEL]: And it would be hard to give the defendant a fair trial based on what you have heard or what you know?
"JUROR SMITH: Probably so.
 "[DEFENSE COUNSEL]: I believe I would challenge Mrs. Smith.
"[PROSECUTOR]: I would like to ask a question.
"THE COURT: All right.
 "[PROSECUTOR]: Mrs. Smith, we are now trying any [sic] case today by the State of Alabama versus Danial Siebert for the death of a Linda Ann Jarman, she was a deaf lady that lived here in the City of Talladega. Could you put any knowledge of what you have seen, heard, read, about anything else, out of your mind and render a verdict in this case and this case alone based upon the evidence that comes to you from the witness stand and the exhibits that are allowed into evidence by the Judge, and the Judge's instructions as to the law? Can you do that?
"JUROR SMITH: Yes, sir.
 "[PROSECUTOR]: So, anything that you have heard, read, or anything else, you can put that totally out of your mind and render a fair and impartial verdict, based upon the evidence?
"JUROR SMITH: Yes, sir.
"[PROSECUTOR]: Thank you very much.
 "[DEFENSE COUNSEL]: So, the fact that you have heard of him having been charged with committing other crimes, that wouldn't affect the way you would rule on this case?
"JUROR SMITH: I don't think so.
 "[DEFENSE COUNSEL]: You wouldn't hesitate to find him not guilty on this because of your knowing that he might be charged with another crime?
"JUROR SMITH: No, sir.
"[DEFENSE COUNSEL]: Wouldn't hesitate at all?
"[ASSISTANT PROSECUTOR]: She is saying no.
 "[DEFENSE COUNSEL]: So, were you just mistaken a minute ago when you said you would have a hard time putting that out?
 "JUROR SMITH: Well, no, I was just thinking more of the other case in case the same jury was used on all the cases.
 "[DEFENSE COUNSEL]: So, if you were selected as a juror in this case, you would still think about him having been charged with the other cases?
"JUROR SMITH: No, sir, I don't believe so. *Page 597 
"[DEFENSE COUNSEL]: Just this one right here?
"JUROR SMITH: Yes.
 "[DEFENSE COUNSEL]: And in deciding your verdict, you wouldn't keep thinking about that he might be charged with another crime?
"JUROR SMITH: I would go by the evidence.
"[DEFENSE COUNSEL]: In this case alone?
"JUROR SMITH: Uh, huh. (Affirmative response)
 "[DEFENSE COUNSEL]: Now, do you think that if he chose not to testify in this case would you hold that against him?
"JUROR SMITH: No.
 "[DEFENSE COUNSEL]: Would you think that he ought to get up there and tell his side of it?
"JUROR: Well, no.
 "[DEFENSE COUNSEL]: If you had to decide right now would you find him not guilty?
"JUROR SMITH: Yes, sir.
 "[DEFENSE COUNSEL]: Would you tell me what you think. Do you think he is probably guilty of what he is charged with?
"[PROSECUTOR]: Judge, again, we object.
"[DEFENSE COUNSEL]: She has got a right —
 "[PROSECUTOR]: We object to him asking her a question, having her to render her judgment, she is asked to sit upon facts which are not in evidence. We have no testimony from the witness stand. He is asking her thoughts as to whether or not he is guilty or not guilty.
 "[DEFENSE COUNSEL]: And that is exactly what voir dire is for.
 "THE COURT: Do you have a fixed opinion of the man's guilt or innocence, already?
"JUROR SMITH: No, sir.
"THE COURT: All right.
 "[DEFENSE COUNSEL]: Do you have a probable opinion? Do you think he is probably innocent or probably guilty?
 "JUROR SMITH: No, because I have not heard the evidence.
". . . .
 "THE COURT: The question, again, if you were chosen to serve on this case, could you render a fair and impartial verdict based solely on the evidence allowed in the case and my charge as I give it to you on the law?
"JUROR SMITH: Yes, sir.
"THE COURT: You can do that?
"JUROR SMITH: Yes.
"THE COURT: Overrule the challenge."
As stated previously, it is clear that Juror Smith adequately assured the court that she could base her decision solely on the evidence presented at trial, despite any opinions or feelings she might have previously had. Therefore, her opinion was not "fixed" as to the appellant's guilt. See Ex parteRutledge, supra; Nobis v. State, supra; McCorvey v. State, supra. The trial court properly overruled the appellant's challenges for cause as to these two prospective jurors.
 VII
The appellant argues that the prosecutor, during the sentencing phase, in attempting to prove an aggravating circumstance, should not have been allowed to go into the details of the appellant's prior conviction for manslaughter. The prosecutor had indicated that the State would attempt to prove the aggravating circumstance that "[t]he defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person". §13A-5-49(2), Code of Alabama (1975). Thus, the prosecutor introduced evidence of a prior conviction of manslaughter and introduced evidence concerning the circumstances of the manslaughter in order to prove the violence. The prosecutor asked a police officer, who testified concerning the appellant's prior manslaughter conviction, the following questions:
"Q: How did he die?
"A: Multiple stab wounds.
"Q: How many multiple stab wounds?
 "A: Total wounds, we are not sure. We stopped at 29." *Page 598 
Thereafter, on cross-examination, the defense counsel asked the police officer the following questions:
 "Q: Weren't a number of those wounds on the victim's legs?
"A: They were throughout his body.
". . . .
 "Q: And there was testimony in the trial that Mr. Siebert was lying on the ground and the victim was standing when some of these wounds were inflicted, is that correct?
". . . .
"Q: . . . Was the victim a homosexual?
"A: Yes, sir.
". . . .
 "Q: And there was testimony about advances being made toward the defendant, wasn't there?"
Thereafter, on redirect examination, the following transpired:
 "Q: . . . How was the testimony in evidence as to how the defendant was dressed at the time, wasn't he naked at the time that he put the stab wounds in him? Wasn't that the evidence?
"A: I'm not positive.
". . . .
 "Q: I believe he fled the scene and were [sic] some time getting into custody, wasn't he?
"A: Yes, sir."
On re-cross examination, the following transpired:
"Q: Do you know how they did catch him?
"A: He gave himself up.
 "Q: Talking about the defendant being unclothed, there was some testimony about the other fellow going in on him, wasn't there? Into the apartment, into the room?
"A: Again, that came from the defendant."
Finally, on redirect examination, the following transpired:
 "Q: I have just got one more. He didn't come on him 29 different times, did he? I mean, he didn't charge on him 29 different times, did he?
 "A: I have no way of telling. All I got was 29 wounds."
Initially, we note that the testimony regarding the victim's homosexuality and the nakedness of the appellant resulted from the defense counsel's questioning and "opened the door" for the prosecutor's subsequent questions on the subject. SeeSandifer v. State, 535 So.2d 203 (Ala.Cr.App. 1988); McCray v.State, 548 So.2d 573 (Ala.Cr.App. 1988). Furthermore, the testimony concerning the number of stab wounds inflicted on the victim by the appellant was properly admitted to show the violent nature of the offense, under § 13A-5-45(c) and (d),Code of Alabama (1975). That Code section, which addresses the admissibility of evidence in a sentence hearing, states, in pertinent part:
 "(c) At the sentence hearing evidence which may be presented as to any matter that the court deems relevant to sentence shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51 and 13A-5-52. . . .
 "(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
We find that the testimony regarding the violence of the appellant's prior manslaughter offense was relevant and of probative value in the sentencing aspect of the trial. SeeHallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988).
 VIII
The appellant argues that the trial court erred in allowing into evidence a videotape of the crime scene. The appellant argues that the videotape was cumulative of photographs which were introduced into evidence and was also highly prejudicial in *Page 599 
that it contained certain "close-ups" of the victim's face showing decomposition. However, Captain Willard Hurst testified that the videotape depicted certain areas of the victim's apartment which were not photographed. He further testified that many of the photographs were of poor quality because of weak batteries and that there was no other camera available to take the photographs. He also testified that videotaping the crime scene has become common practice in his jurisdiction.
We find that the videotape was properly admitted into evidence. Captain Hurst testified that he made the video of the interior of the apartment and he stated that, after viewing the videotape, he concluded that it accurately and fairly depicted the interior of the victim's apartment as it appeared on February 24, 1986. Further, there is a date and time of filming on the videotape.
 "Provided that a proper foundation is laid, the admissibility of videotaped evidence in a criminal trial is matter within the sound discretion of the trial judge. Annot., 60 A.L.R.3d 333 (1974). See Thompson v. State, 462 So.2d 777, 779-80
(Ala.Cr.App. 1984). The State established the proper foundation here, and there is no question regarding the authenticity of the videotape. The fact that the tape was cumulative to other photographic evidence is not a basis for reversal. Photographic evidence is admissible even though it may be cumulative or demonstrative of undisputed facts. Hopkins v. State, 429 So.2d 1146, 1157
(Ala.Cr.App. 1983)."
Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App. 1986).
Furthermore, the videotape was admissible despite the appellant's claim that it was highly inflammatory because it showed the decomposition of the victim's body. The same rule applies for videotapes as for photographs: "The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Ex-parte Carpenter, 400 So.2d 427 (Ala. 1981)." Walker v.State, 416 So.2d 1083, 1090 (Ala.Cr.App. 1982). See also Whitev. State, 435 So.2d 1367, 1371 (Ala.Cr.App. 1983).
 "These photographs did have 'some tendency to prove or disprove some disputed or material issue' or 'to illustrate or elucidate some other relevant fact or evidence, or corroborate or disprove some other evidence offered or to be offered.' Baldwin v. State, 282 Ala. 653, 655, 213 So.2d 819, 820 (1968). There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk 'comes with the territory.' "
Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App. 1988).
"Further, the receipt into evidence of such exhibits lies within the sound discretion of the trial court. Hopkins v.State, 429 So.2d 1146 (Ala.Cr.App. 1983)." Burton v. State,521 So.2d 91, 92 (Ala.Cr.App. 1987). We find no abuse of discretion by the trial court in allowing the videotape into evidence.
 IX
In accordance with § 13A-5-53, Code of Alabama (1975), we have reviewed the record, including the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant, and we have found none. Nor do we find any evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of two aggravating circumstances: that the capital offense was committed while the appellant was engaged in the commission of a robbery; and that the defendant had been previously convicted of another capital felony or a felony involving the use or threat of violence to the person. The trial court's reasons for finding these two aggravating circumstances are amply supported by the evidence. See Parts IV and VII.
The court properly found the existence of no mitigating circumstances, based on the evidence presented at trial. After considering the pre-sentence investigation report, the trial court found: that the defendant had a significant history of prior criminal activity; that the capital offense was not *Page 600 
committed while the defendant was under the influence of extreme mental or emotional disturbance; that the victim was not a participant in the defendant's conduct and did not consent thereto; that the defendant did not have an accomplice and was the sole perpetrator of the capital offense; that the defendant did not act under extreme duress or under the substantial domination of another person; that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; and that the age of the defendant at the time of the crime was 31 years. These findings by the trial court are supported by the evidence. The appellant failed to prove any non-statutory mitigating circumstances.
The trial judge also considered the jury's advisory verdict of death, before determining that the aggravating circumstances outweighed the mitigating circumstances. Our independent weighing of the aggravating and mitigating circumstances supports the trial court's conclusion that death was the proper sentence.
The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See Acres v.State, 548 So.2d 459 (Ala.Cr.App. 1987); Baldwin v. State,456 So.2d 117 (Ala.Cr.App. 1983), affirmed, 456 So.2d 129
(Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985); Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), affirmed, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038,106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Bracewell v. State,475 So.2d 616 (Ala.Cr.App. 1984).
The record is devoid of any indication of plain error. Therefore, the appellant's judgment of conviction and sentence of death are proper. The judgment of the circuit court is affirmed.
AFFIRMED.
All the Judges concur.